JDN

**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

David L. Gossett,                          )    No. CV 08-2120-PHX-DGC (ECV)
                                           )
              Plaintiff,                   )    **ORDER**
                                           )
v.                                         )
                                           )
Robert Stewart, et al.,                    )
                                           )
              Defendants                   )
_____)

Plaintiff David L. Gossett brought this civil rights action under 42 U.S.C. § 1983 against multiple Arizona Department of Corrections (ADC) employees (Doc. 74).  Before the Court is Defendants' Motion for Summary Judgment (Doc. 130), which Plaintiff opposes (Doc. 145).[1]  Also pending is Plaintiff's combined Motion for Extension to file a response to Defendants' request to supplement their statement of facts and Motion for Leave to file a reply to Defendants' reply (Doc. 160).

The Court will deny Plaintiff's motion for an extension and for leave to file a reply, grant Defendants' summary judgment motion, and terminate the action.

**I.    Background**

Plaintiff's claims arose during his confinement at the Arizona State Prison Complex-Eyman Complex (Doc. 74).  In his Second Amended Complaint, he named as Defendants (1) Captain James Long; (2) Lieutenant Barry Fernandez; (3) Sergeant Morrow;

_____

[1]The Court issued the Notice required under <u>Rand v. Rowland</u>, 154 F.3d 952, 962 (9th Cir. 1998), informing Plaintiff of his obligation to respond to Defendants' motion and the requirements under Federal Rule of Civil Procedure 56 (Doc. 132).

(4) Correctional Officer (CO) II H. Bollweg; (5) CO II M. Daters; (6) Lieutenant Sutton; (7) CO II Madsen; and (8) CO II Brown (id. ¶¶ 6-7).[2]

The Court recognized three claims set forth by Plaintiff (see Doc. 5 at 6; Doc. 60). First, he alleged that on July 8, 2008, Fernandez, Bollweg, and Morrow used excessive force against him in violation of the Eighth Amendment (Doc. 74 ¶¶ 32-33). Next, Plaintiff claimed that Daters, Long, Sutton, Madsen, and Brown violated the Eighth Amendment when they observed the use of excessive force and failed to intervene to protect Plaintiff (id. ¶¶ 32, 34). Finally, Plaintiff alleged that Fernandez retaliated against Plaintiff in violation of the First Amendment when he placed Plaintiff in punitive segregation, issued false disciplinary reports, and used excessive force after Plaintiff lodged complaints with the Warden and Deputy Warden (id. ¶¶ 36-37).

Defendants now move for summary judgment on the grounds that (1) Plaintiff failed to show that Fernandez, Bollweg, and Morrow used excessive force, (2) Plaintiff suffered no injuries, (3) there was no duty to intervene imposed on Long, Daters, Sutton, Madsen, or Brown, (4) Fernandez's actions were not retaliatory, and (5) Defendants are entitled to qualified immunity (Doc. 130).

**II.    Plaintiff's Motion for Extension and Motion for Leave to File a Sur-Reply**

In his motion, filed on February 24, 2012, Plaintiff seeks an extension to file a response to Defendants' Motion for Leave to Supplement their Statement of Facts (Doc. 160, ref. Doc. 151). The Court has already ruled on Defendants' motion; therefore, Plaintiff's request is moot (Doc. 157). Plaintiff's other request—for leave to file a reply to Defendants' Response to Plaintiff's Statement of Facts—is construed as a request for leave to file a sur-reply. Plaintiff presents no support for filing a sur-reply, and the Court finds none. It is

---

[2]Plaintiff also named as Defendants Warden Robert Stewart, Deputy Warden Alex Davenport, and numerous John and Jane Does (Doc. 74 ¶¶ 4-5, 7-8). These Defendants will be dismissed pursuant to the Court's December 15, 2009 order, which permitted Plaintiff to file a Second Amended Complaint and add Morrow, Long, Sutton, Madsen, and Brown as Defendants (Doc. 60 at 2). The Court specifically directed that no other defendants may be added (id. at 3).

1  unnecessary to wait for a reply to Plaintiff's motion, and the motion will be denied.

2  **III.   Summary Judgment**

3       A court must grant summary judgment "if the movant shows that there is no genuine

4  dispute as to any material fact and the movant is entitled to judgment as a matter of law."

5  Fed. R. Civ. P. 56(a); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  Under

6  summary judgment practice, the movant bears the initial responsibility of presenting the basis

7  for its motion and identifying those portions of the record, together with affidavits, that it

8  believes demonstrate the absence of a genuine issue of material fact.  <u>Celotex</u>, 477 U.S.

9  at 323.

10      If the movant meets its initial responsibility, the burden then shifts to the nonmovant

11  to demonstrate the existence of a factual dispute, that the fact in contention is material (a fact

12  that might affect the outcome of the suit under the governing law), and that the dispute is

13  genuine (the evidence is such that a reasonable jury could return a verdict for the

14  nonmovant).  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 250 (1986) ; <u>see</u> <u>Triton</u>

15  <u>Energy Corp. v. Square D. Co.</u>, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need

16  not establish a material issue of fact conclusively in its favor, <u>First Nat'l Bank of Ariz. v.</u>

17  <u>Cities Serv. Co.</u>, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific

18  facts showing that there is a genuine issue for trial."  <u>Matsushita Elec. Indus. Co., Ltd. v.</u>

19  <u>Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (internal citation omitted); <u>see</u> Fed. R. Civ. P.

20  56(c)(1).

21      At summary judgment, the judge's function is not to weigh the evidence and

22  determine the truth but to determine whether there is a genuine issue for trial.  <u>Anderson</u>, 477

23  U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence, and draw all

24  inferences in the nonmovant's favor.  <u>Id.</u> at 255.

25  **IV.   Factual Assertions**

26      With their motion, Defendants submit a separate Statement of Facts (DSOF)

27  (Doc. 131) which is supported by declarations from Defendants and other ADC officials and

28  attachments, and an excerpt from Plaintiff's deposition (<u>id.</u>, Exs. A-P).  Defendants also

submit a CD video of the July 8, 2008 incident (Doc. 133).  Plaintiff responds with his own separate Statement of Facts (PSOF) (Doc. 146 at 1-23) and a Controverting Statement of Facts (PCSF) (id. at 24-28) that corresponds to DSOF.  Plaintiff supports his factual assertions with his own declaration and attachments and the declarations of other inmates, Defendants' interrogatory responses and request-for-admissions responses, and various ADC documents and reports (id., Exs. A-Y).  Finally, Defendants submitted a Supplemental Statement of Facts (DSSF) (Doc. 154) and they filed disputes and objections to PSOF and Plaintiff's exhibits (Doc. 153 at 13-26).  The parties both set forth many irrelevant facts.  The Court will consider only the relevant background and material facts and address only those objections made by Defendants that relate to factual assertions considered in the summary judgment analysis.

The undisputed and disputed facts are as follows:

Plaintiff states that since his confinement in the ADC, he has been diagnosed with multiple neck and back-related infirmities, including degenerative disk disease (PSOF ¶ 3).[3] Plaintiff states that as a result of his medical infirmities, his primary health-care providers have issued Special Needs Orders (SNOs) for him to use a cane and a wheelchair to ambulate (id. ¶ 4).[4]  In November 2007, Plaintiff was confined at the ASPC-Florence East Unit and assigned to an ADA-compliant housing unit (PSOF ¶ 19; DSOF ¶ 11).  On November 13, 2007, he was moved to the ASPC-Eyman, Cook Unit and placed in Unit A in Building 5, which is one of the housing units designed to accommodate inmates with special needs

---

[3]Defendants object to Plaintiff's statement regarding his diagnosed infirmities on the grounds that it lacks foundation and is not supported by admissible evidence (Doc. 153 at 13).  The objection is overruled.  Plaintiff supports his statement with his declaration and he has personal knowledge of his own medical conditions (Doc. 146, PSOF ¶ 3).  See Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 602; Bank Melli Iran v. Pahlavi, 58 F.3d 1406, 1412 (9th Cir. 1995).  Moreover, the specific details of Plaintiff's diagnoses are not material to claims at issue.

[4]Defendants objection to PSOF ¶ 4 is overruled (Doc. 153 at 13).  Plaintiff's factual assertion is supported by his declaration, and Defendants do not dispute that SNOs for a cane and wheelchair have been issued.  See Fed. R. Civ. P. 56(c)(4).

(PSOF ¶¶ 20-21).[5]  Housing Units A and B inside Building 5 were commonly referred to as the "ADA runs" (ref. to the Americans with Disabilities Act) (id. ¶ 44).

### A.    March 5, 2008 Incident

On March 5, 2008, Plaintiff was seen in the Health Unit for complaints of respiratory distress related to inmates smoking in his housing area; Nurse Adames examined Plaintiff (DSOF ¶ 13; PCSF ¶ 13).  Fernandez arrived at the Health Unit (DSOF ¶ 16; PSOF ¶ 24). Defendants state that Plaintiff's treatment in medical was completed and he was cleared to return to his housing unit (DSOF ¶¶ 15-16).  Fernandez directed Plaintiff to leave the Health Unit and return to his housing unit (DSOF ¶ 16; PSOF ¶ 24).  Plaintiff states that his treatment was not completed (PCSF ¶¶ 15-16; PSOF ¶¶ 24-25).[6]  According to Plaintiff, he told Fernandez that he was waiting to see the doctor, but Fernandez escorted him out of the Health Unit and placed him in a holding enclosure (PSOF ¶ 24; DSOF ¶¶ 19-20 (in part)).

After he was in the enclosure, Plaintiff saw and spoke to Deputy Warden Davenport; Plaintiff complained to Davenport that Fernandez had interfered with Plaintiff's medical treatment (PSOF ¶ 27 (in part)).[7]  Plaintiff was returned to the Health Unit (DSOF ¶ 22; PSOF ¶ 28 (in part)).

Fernandez wrote an Inmate Disciplinary Report that charged Plaintiff with "Disobey Order, Rules, Policies, other Directives" (DSOF ¶ 23; PSOF ¶ 30 (in part)).  That same day—March 5, 2007—Plaintiff was moved to SMU I pursuant to the Disciplinary Report (DSOF ¶ 25; PSOF ¶ 31).

---

[5]Defendants dispute PSOF ¶ 21 and argue that Plaintiff's cited documents do not support his assertion (Doc. 153 at 14).  The Court finds that Plaintiff's evidence supports that Unit A in Building 5 was specifically designed to accommodate inmates with special medical needs (see Doc. 146, PSOF ¶ 21).

[6]Defendants' objections to PSOF ¶¶ 24-25 are overruled because the objections stem from the dispute between the parties and rely on the Court giving more credibility to Defendants' proffered declaration over Plaintiff's declaration, which the Court cannot do on summary judgement (Doc. 153 at 14).  See Anderson, 477 U.S. at 255.

[7]Defendants' objection to PSOF ¶ 27 is overruled (Doc. 153 at 15).  Plaintiff has personal knowledge of what he told the Deputy Warden. Fed. R. Civ. P. 56(c)(4).

Plaintiff states that while he was in SMU I, he sent inmate letters to Deputy Warden Davenport and Warden Stewart to complain about Fernandez's conduct, but he received no responses to the letters (PSOF ¶ 32).[8]

On April 7, 2008, the March 5 Disciplinary Report issued against Plaintiff by Fernandez—for disobeying an order—was dismissed (PSOF ¶ 35).[9]

### B.     May 16-July 3, 2008

On May 16, 2008, Plaintiff was transferred to the ASPC-Tucson, Cimarron Unit (DSOF ¶ 33: PSOF ¶ 37).

On May 20, 2008, Plaintiff was examined by a nurse practitioner who issued an SNO for (1) a cane and wheelchair to ambulate; (2) limited duty (no lifting, no pushing or pulling, no climbing); and (3) a lower bunk assignment (DSOF ¶ 34; PCSF ¶ 34; Doc. 131, Ex. N, Ex. 1 (Doc. 131-3 at 8)[10]).

On June 25, 2008, Dr. Emmans examined Plaintiff (DSOF ¶ 37; PSOF ¶ 40).  Dr. Emmans noted that in light of Plaintiff's medical conditions, he required bathroom assistance railings; she therefore requested that Plaintiff be moved to a more appropriate yard (id.).  Dr. Emmans assessed Plaintiff with cervical and lumbar degenerative disc disease and issued an SNO for Plaintiff to be on lay-in/confined to living quarters with bathroom privileges until December 31, 2008 (DSOF ¶¶ 37, 39).

On July 2, 2008, Plaintiff was moved to the ASPC-Tucson, Rincon Health Unit (PSOF ¶ 42).

---

[8]Defendants object to PSOF ¶ 32 on the basis that is lacks foundation (Doc. 153 at 16). This objection is overruled; PSOF ¶ 32 is supported by Plaintiff's declaration, and Plaintiff has personal knowledge to declare what he did. Fed. R. Civ. P. 56(c)(4).

[9]Defendants' objections to PSOF ¶ 35 is sustained in part (Doc. 153 at 16).  The assertion in PSOF ¶ 35 that the disciplinary ticket was dismissed is supported by evidence, but there is no evidence indicating that Sergeant Green dismissed the ticket (id., PSOF ¶ 35).

[10]Additional citation refers to the page number in the Court's Case Management/Electronic Case Filing System.

The next day, he was moved back to ASPC-Eyman Cook Unit (DSOF ¶ 40; PSOF ¶ 43). Plaintiff's inmate record classified him on July 3, 2008 as "ADA Medium" custody (PSOF ¶ 43). He was assigned to Building 5—the building for handicapped inmates and inmates with special medical needs (id. ¶ 44). Building 5 Units A/B are the only buildings in the Cook Unit equipped with safety rails in the showers and bathrooms (PSOF ¶ 47).

### C.     July 8, 2008 Incident

On July 8, 2008, at approximately 7:30 a.m., Plaintiff and another Building 5 inmate—Steven Simpson—looked for and found Fernandez (id. ¶ 48). Plaintiff informed Fernandez that he was now back at the Cook Unit, and Plaintiff asked Fernandez if he could find out when Plaintiff could pick up his personal property (id.). Plaintiff and Simpson then returned to their housing unit (id.).[11]

Just before 9:30 a.m., CO II Fimbres, who worked in Building 5, announced that Plaintiff was to "roll up" his belongings and move to Building 6-A-24, which was an upper bunk in Building 6 (PSOF ¶ 49).[12] Plaintiff states that he explained to Fimbres that he had an SNO that required him to be housed on a lower bunk and in a building with safety rails in the bathrooms; Plaintiff asked to speak to a supervisor (id. ¶ 50).[13] Fernandez arrived a few minutes later, and Plaintiff explained to Fernandez that he was an ADA inmate and could not be moved since he had an SNO for a lower bunk and housing with bathroom safety rails (PSOF ¶ 51). At that time, Plaintiff's AIMS report showed that Plaintiff had to be housed

---

[11]Defendants' objection to PSOF ¶ 48 is overruled (Doc. 153 at 17). Plaintiff has personal knowledge of what he did and what he said to Fernandez. See Fed. R. Civ. P. 56(c)(4).

[12]Defendants state that Bollweg gave Plaintiff the verbal order to move from Building 5 to Building 6 (DSOF ¶ 42); however, they do not dispute or object to Plaintiff's assertion that it was actually Fimbres (Doc. 153 at 17).

[13]Defendants' objection to PSOF ¶ 50 is overruled (Doc. 153 at 17). Plaintiff's has personal knowledge of what he did and said to Fimbres. See Fed. R. Civ. P. 56(c)(4).

1   in a facility with safety rails in the bathrooms (id. ¶ 52).[14]

2      Defendants state that Fernandez instructed Plaintiff to move to the day room of

3   Building 6 until he could verify Plaintiff's status with medical, but Plaintiff refused to move

4   and became verbally aggressive (DSOF ¶ 46).  Defendants state that Plaintiff refused a direct

5   order to move to Building 6 (DSOF ¶ 49).  Plaintiff states that Fernandez never instructed

6   him to move to the day room of Building 6 while Fernandez verified his status; rather,

7   Plaintiff states that Fernandez informed Plaintiff that he was going to be placed in a holding

8   enclosure and Fernandez directed Plaintiff to step outside (PSOF ¶ 56).[15]

9      Defendants state that because Plaintiff refused to move, Fernandez instructed him to

10  walk towards the holding enclosure and Fernandez, Bollweg, and Morrow started to escort

11  Plaintiff to the enclosure (DSOF ¶ 53).  Plaintiff had his cane in one hand and a zip-lock bag

12  with medication in the other hand (PSOF ¶ 57).

13     Defendants submit the following facts as to what happened next: As they were

14  walking, Plaintiff turned toward them in an aggressive manner with his cane in his hand

15  (DSOF ¶ 54).  Defendants thought Plaintiff may attempt to hit one of them, so Bollweg put

16  his arms around Plaintiff's arms and brought Plaintiff's arms behind his back; he held

17  Plaintiff until Morrow and Fernandez could get control of Plaintiff's arms and restraints

18  could be applied (DSOF ¶ 55).  Fernandez applied pressure to Plaintiff's hand, and he

19  dropped his cane (id. ¶ 56).  Plaintiff resisted application of hand restraints, but Defendants

20  were able to get control of Plaintiff's arms and apply the restraints (id. ¶¶ 58-59).  During the

21  restraining process, Plaintiff was yelling and swearing at them (id. ¶ 61).

22     At the time of the incident, Daters exited the Health Unit, saw the situation, and

23  activated the Incident Control System (ICS) (id. ¶ 62).  Madsen and Sutton heard the ICS call

24

25     [14]"AIMS" refers to the Arizona Inmate Management System, a computerized Master

26  Record file maintained by the ADC for every inmate (Doc. 131, DSOF ¶ 50).

27     [15]Defendants' objection to PSOF ¶ 56 is overruled (Doc. 153 at 17).  Plaintiff has

28  personal knowledge as to what happened to him, and the parties' dispute as to how the
    incident unfolded is set forth herein.  See Fed. R. Civ. P. 56(c)(4).

on the radio and responded to the area (id. ¶¶ 64-65).  Brown was in the area and noticed the disturbance, so he walked over (id. ¶ 66).  When Brown and Sutton arrived, Plaintiff was secured with his hands cuffed behind his back, so Brown left the area (id. ¶¶ 68-69).  Morrow and Daters went to retrieve a gurney (id. ¶¶ 70-71).  Fernandez ordered Plaintiff to lie face down on the gurney, Plaintiff complied, and Daters assisted (id. ¶ 71).  Morrow then placed leg restraints on Plaintiff (id. ¶ 73).  At this point, Madsen arrived and saw Plaintiff on the gurney (id. ¶ 74).  Plaintiff was wheeled to the enclosure, where his restraints were removed and he remained housed for a short time, until Madsen and Sutton returned and escorted him to the Health Unit for medical treatment (id. ¶¶ 75, 79, 80, 83).

Plaintiff describes the incident as follows:  As they were walking toward the enclosure, Plaintiff was explaining to Defendants that he had special medical needs that required him to be housed in Building 5 and they just needed to check the AIMS report to verify it (PSOF ¶ 58).[16]  Plaintiff did not use abusive or profane language, but Fernandez, Morrow, and Bollweg were verbally abusing Plaintiff (id.).  As they were walking, Plaintiff did not turn back toward Defendants or hold up his cane (id. ¶ 68).  Bollweg grabbed Plaintiff roughly from behind and wrapped his arms around Plaintiff, causing Plaintiff to falter and suffer pain in his back, neck and arms (id. ¶ 59).  Fernandez then appeared to kick at Plaintiff's cane to knock Plaintiff off balance (id. ¶ 60).  Fernandez, Morrow, and Bollweg grabbed Plaintiff's arms and twisted his arms and wrists, and Plaintiff felt what he thought was a knee placed in his back (id. ¶¶ 60, 63).  Plaintiff dropped his cane and bag of medication, and he was cuffed (id. ¶ 64).  Plaintiff did not resist cuffing (id. ¶ 66).

An ICS was activated, and Brown arrived at the scene and began filming the incident with a hand-held camcorder (id. ¶¶ 69-70).  After he was hand-cuffed, Plaintiff stood hunched over in pain and could not walk (id. ¶ 73).  Once the gurney arrived, Plaintiff was

---

[16]Defendants' objections to PSOF ¶¶ 56, 58-60, 63-64, 66, 68, 70, 73-74, and 78 are overruled (Doc. 153 at 19-20).  Plaintiff has personal knowledge as to what happened to him, and the objections stem from the parties' dispute, which is set forth herein.  See Fed. R. Civ. P. 56(c)(4).

thrown onto it face-down, and Morrow applied leg restraints—all of which caused Plaintiff unnecessary pain (id. ¶¶ 74-75).  Plaintiff was wheeled to the enclosure and the restraints were removed (id. ¶ 77).  A few minutes later, Sutton and Madsen returned to the enclosure, confirmed that Plaintiff had a need to remain in Building 5, and escorted Plaintiff to the Health Unit for treatment (id. ¶¶ 78-79).

After Plaintiff received treatment, medical staff issued him an SNO for ADA status and a lower bunk, and he was returned to Building 5 (DSOF ¶¶ 84, 87).

As a result of the July 8, 2008 incident, Fernandez filed two Inmate Disciplinary Reports against Plaintiff: one for disrespect by profanity, obscene/abusive language or gesture, and disobeying orders and policies (DSOF ¶ 89); and the other for violation of rules and policies by attempting to use his cane as a weapon (PSOF ¶ 88).  Defendants state that the second Report did not specifically refer to a cane (Doc. 153 at 21).  Plaintiff states that, after a disciplinary hearing, he was found guilty of the first Report—which was treated as a minor infraction, and he received 15 days' loss of privileges (PSOF ¶ 92; DSOF ¶ 91).  Plaintiff states that the second Report was dismissed (PSOF ¶ 90).[17]

**V.     Eighth Amendment Claim**

      **A.     Legal Standard**

Use of excessive force against an inmate violates the inmate's Eighth Amendment right to be free from cruel and unusual punishment.  Graham v. Connor, 490 U.S. 386, 393-94 (1989).  The use of force is constitutional if it is used in a good faith effort to keep or restore discipline; it is unconstitutional if it is used "maliciously and sadistically for the very purpose of causing harm."  Whitley v. Albers, 475 U.S. 312, 320-21 (1986).  Not "every malevolent touch by a prison guard gives rise to a federal cause of action"; thus, de minimis uses of physical force, provided that use of force is not "repugnant to the conscience of mankind," do not offend the Constitution.  Hudson v. McMillan, 503 U.S. 1, 9-10 (1992).

---

[17]Defendants' objection to PSOF ¶ 90 is overruled.  Defendants' dispute as to the contents of the Report is set forth herein, and Defendants do not dispute or object to the assertion that the second Report was dismissed (Doc. 153 at 22).

1    A court considers five factors in determining whether a defendant's use of force was

2    sadistic and malicious for the purpose of causing harm: (1) the extent of the injury, (2) the

3    need to use the force, (3) the relationship between the need and the amount of force used,

4    (4) the threat "reasonably perceived" by the officials, and (5) "any efforts made to temper the

5    severity" of the force.  Id. at 7 (citing Whitley, 475 U.S. at 321).  When reviewing these

6    Whitley factors, the Court must remember that prison officials "should be accorded

7    wide-ranging deference in the adoption and execution of policies and practices that in their

8    judgment are needed to preserve internal order and discipline and to maintain institutional

9    security."  Whitley, 475 U.S. at 321-22 (quoting Bell v. Wolfish, 441 U.S. 520, 547 (1979)).

10        **B.     Arguments**

11            **1. Defendants' Motion**

12    Defendants argue that there was no use of excessive force on July 8, 2008 (Doc. 130

13    at 9).  They submit that any force used was in response to Plaintiff's conduct, was

14    appropriate, and was in a good-faith effort to maintain or restore discipline (id. at 10).

15    According to Defendants, the facts show that when Fernandez, Bollweg, and Morrow were

16    walking with Plaintiff to the enclosure, Plaintiff turned toward them in an aggressive manner

17    with his cane in his hand and, for this reason, Defendants restrained him and cuffed him

18    behind his back (id. at 11).  Defendants assert that Plaintiff resisted the hand restraints (id.).

19    They conclude that there are no facts indicating that Fernandez, Bollweg, and Morrow

20    treated Plaintiff in a physically rough or overly aggressive manner and there are no facts to

21    show that Fernandez tried to kick Plaintiff's cane away or that Morrow placed his knee in

22    Plaintiff's back as Plaintiff alleged in his pleading (id. at 12).  Defendants further assert that

23    a video of the incident shows that Fernandez, Bollweg, and Morrow exercised a proper use

24    of force; they contend that the video contradicts Plaintiff's version of the event (id., Doc.

25    133).

26        Defendants also argue that Plaintiff suffered no injuries as a result of the July 8, 2008

27    confrontation and that there are no medical records to tie any pain or injuries to the July 8

28    event (Doc. 130 at 13-14).  They insist that the record shows Plaintiff already suffered neck

1    and back pain before the July 8 incident and when he was seen by medical immediately after

2    the incident, he was not provided any medications for injuries (id.).

3        As to the failure-to-intervene claim against Daters, Long, Sutton, Madsen, and Brown,

4    Defendants maintain that absent any use of excessive force, there was no reason for anyone

5    to intervene to protect Plaintiff (id. at 14).  Defendants argue that, even assuming there was

6    excessive force, Long, Sutton, Madsen, and Brown cannot be liable for failure to intercede

7    because they were not present during the events that Plaintiff alleges caused him injury (id.

8    at 14-15).  Defendants state that these four Defendants all arrived on the scene after Plaintiff

9    was secured or on the gurney (id. at 15).

10                 **2. Plaintiff's Response**

11        Plaintiff states that on July 8, 2008, his status on his AIMS report showed that he was

12    "ADA Medium" custody and he had SNOs for a lower bunk and housing with safety rails

13    (Doc. 145 at 19).  Plaintiff contends that given his status, when he was told to move to

14    Building 6, he had a right to decline to obey the order because a move to Building 6 could

15    have resulted in immediate, irreparable, and potentially permanent physical injury (id.).  He

16    submits that the order to move was unconstitutional and that Defendants refused to honor

17    Plaintiff's valid ADC medical restrictions and SNOs (id. at 19, 24).

18        Plaintiff asserts that, contrary to Defendants' claims, he did not turn around and raise

19    his cane or act in an aggressive manner or even clench his fists because he was holding a

20    cane and a medication bag in his hands (id. at 20).  Plaintiff notes that there were three large

21    officers escorting a 55-year old handicapped inmate who required a cane to walk (id. at 21).

22    According to Plaintiff, there was no need for any force and restraining him with extreme

23    force and "radical control techniques" that caused him significant pain was unnecessary (id.

24    at 20).  Plaintiff further argues that Fernandez, Bollweg, and Morrow continued their

25    misconduct when they threw Plaintiff face down on the gurney while his hands were cuffed

26    behind his back (id. at 21).  Plaintiff submits that it would have been obvious that such

27    conduct would cause severe pain to someone who suffered from Plaintiff's medical

28    conditions (id.).  Plaintiff notes that following the incident, Fernandez and Bollweg prepared

1   use-of-force reports in which they claimed that Plaintiff attacked them with his cane before

2   force was employed, and none of these reports stated that Plaintiff resisted the application

3   of hand restraints (id. at 24).

4          Plaintiff maintains that the video of the incident belies Defendants' assertions that

5   Plaintiff acted aggressively and force was required (id.). Plaintiff adds that footage captured

6   on a hand-held camcorder, which arrived on the scene after Plaintiff was hand-cuffed but

7   before he was thrown onto the gurney, would support his assertions that excessive force was

8   used (id. at 21-22). But that footage, which Plaintiff claims was turned over to Fernandez,

9   has disappeared (id. at 21-22). Plaintiff therefore argues that it may be inferred that the

10  footage would be unfavorable to Defendants (id. at 22).

11         As to injuries that he suffered on July 8, 2008, Plaintiff avers that he had pain along

12  his entire spine and down his right leg (id. at 23). He asserts that the medical notes from that

13  day reflect that he had poor balance and could not stand on his right leg, that he had obvious

14  palpable spasms from the cervical and lumbar spine, and that he received Toradol and

15  Nubain injections for pain (id.). Plaintiff states that his injuries led the examining physician

16  to issue an SNO verifying that he was an ADA inmate who belonged in Building 5 and

17  required a cane and a wheelchair (id.). Plaintiff adds that he required subsequent neck and

18  back treatment in August for injuries stemming from the July 8 incident (id.).

19         Plaintiff concludes that the record, when viewed in his favor, provides evidence from

20  which a jury could conclude that Plaintiff never used or attempted to use his cane as a

21  weapon; that no force was necessary; that Fernandez, Bollweg, and Morrow would have

22  known that the force they used would cause Plaintiff severe pain and harm; and that Plaintiff

23  was injured as a result of the force used (id. at 25). Plaintiff maintains that these disputed

24  material facts preclude summary judgment on the excessive-force claim (id.).

25         With respect to the failure-to-intervene claim against Madsen, Sutton, Daters, and

26  Brown, Plaintiff contends that these Defendants were all present when the gurney was

27  brought and Plaintiff was slammed onto it (id. at 26). Plaintiff asserts that Brown's statement

28  that he simply happened along the scene and then left is belied by evidence that he remained

1   and recorded on a camcorder everything that transpired after Plaintiff's cuffing (id.).

2   Plaintiff argues that these Defendants' inaction is sufficient for liability under the Eighth

3   Amendment (id. at 27).

4   ### 3. Defendants' Reply

5   Defendants contend that Plaintiff's version of the July 8, 2008 incident is clearly

6   contradicted by the video evidence (Doc. 153 at 2).  They reiterate their claim that

7   Defendants properly restrained Plaintiff after he acted in an aggressive manner with his cane

8   in his hand and that the video requires entry of summary judgment in their favor (id. at 3).

9   They also reiterate that there is no evidence to support Plaintiff's contention that Madsen,

10   Sutton, Daters, and Brown failed to protect him because there was no excessive force on

11   July 8, 2008 (id. at 3-4).  According to Defendants, the video clearly shows that Plaintiff was

12   not slammed onto the gurney (id. at 4).  Defendants acknowledge that there is documentation

13   that a camcorder was used by Brown, but they state that no footage is known to exist and

14   Brown did not videotape the incident (id.).

15   Defendants again argue that Plaintiff sustained no injuries on July 8, and they note

16   that he did not receive pain injections that day but a week later, on July 15, 2008 (id. at 5).

17   They also note that Plaintiff was not officially on ADA status until July 8, 2008, and that the

18   AIMS report showing "ADA Medium" is simply a housing assignment, not an ADA

19   designation (id. at 5-6).

20   Defendants assert that Plaintiff did not have a right to disobey directives because there

21   is no factual support for his claim that he would have been subjected to "immediate

22   substantial, irreparable and potentially permanent physical injury" if he disobeyed

23   Fernandez's directive (id. at 6-7).  They state that there was nothing illegal about Fernandez's

24   orders (id.).

25   ### C.   Analysis

26   #### 1. Fernandez, Bollweg, and Morrow

27   In analyzing Plaintiff's claim under the Whitley factors, the Court applies the facts as

28   presented by the parties and, where the facts are disputed, takes Plaintiff's facts as true.  See

1  Anderson, 477 U.S. at 255.

2                    **a.  Extent of Injury**

3       Serious injury is not required to establish an Eighth Amendment violation; indeed, the

4  malicious and sadistic use of force by prison officials always violates the contemporary

5  standards of decency, regardless of whether significant injury is evident.  See Wilkins v.

6  Gaddy, 130 S. Ct. 1175, 1178 (2010); Hudson, 503 U.S. at 7, 9; Oliver v. Keller, 289 F.3d

7  623, 628 (9th Cir. 2002) (excessive force standard examines de minimis uses of force, not

8  de minimis injuries).

9       Here, the record shows that Plaintiff suffered degenerative disk disease that required

10  ongoing treatment and special accommodations.  He avers that he suffered extreme pain

11  when his arms were grabbed and twisted behind him during the July 8 incident, and that he

12  continued to suffer back pain for some time thereafter.  Further, there is no dispute that

13  immediately after the July 8 incident, Defendants took Plaintiff to the Health Unit for

14  treatment.  Thus, the Court finds that, while Plaintiff's injuries were not serious or life-

15  threatening, they were more than insignificant.

16                    **b.  Need for Force**

17       It is the need for force which is at the heart of an excessive force determination.

18  Alexander v. City and County of S.F., 29 F.3d 1355, 1367 (9th Cir. 1994).  There is no

19  dispute that on July 8, 2008, Plaintiff refused to obey a directive from Fernandez to move to

20  Building 6 or that, as they walked to the enclosure, Plaintiff proceeded to argue with

21  Fernandez to try to convince him that, for medical reasons, Plaintiff could not be transferred

22  to Building 6.  The Court rejects Plaintiff's claim that he had a constitutional right to disobey

23  Fernandez's directive.  Plaintiff relies on the decision in Jackson v. Allen, 376 F. Supp. 1393

24  (D. Ark. 1974), to support his claim that he did not have to comply with Fernandez's order

25  that clearly contradicted doctors' written directives and could have caused him physical harm

26  (Doc. 145 at 19).  In Jackson, however, the District Court found that the prisoner-plaintiff

27  did *not* have the right to resist an order to submit to punishment even where the punishment

28  was later held to be unconstitutional.  376 F. Supp. at 1394.  The Court stated that a right to

refuse an order would arise only in "extreme" circumstances "where resistance to submission to unconstitutional punishment is necessary to prevent one's death" or immediate permanent and substantial injury "that could not later reasonably be legally remedied." Id. at 1395. That was not the case here. Even though the record shows that Plaintiff should not have been housed in Building 6, he was not subject to serious injury or death by temporary placement in Building 6 while prison officials verified his claims that his medical conditions required housing in Building 5. Further, while Plaintiff's refusal to obey this particular order did not present an immediate grave danger to Defendants—such as a refusal to obey an order to put down a weapon—in the prison context, there can be a more subtle threat posed when an inmate refuses to obey an order:

> Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them . . . . Inmates are and must be required to obey orders. When an inmate refuse[s] to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger.

Lewis v. Downey, 581 F.3d 467, 476 (7th Cir. 2009) (citation omitted); see also Jackson, 376 F. Supp. at 1395 (noting that a right to refuse to submit to punishment could seriously undermine discipline in prisons). Thus, Plaintiff's refusal to comply with Fernandez's directive constituted a challenge to prison officials and their authority and escalated tensions between the parties as they began to walk towards the enclosure.

The parties dispute whether Plaintiff turned towards Defendants in an aggressive manner with his cane in his hand. The video, which has no sound, begins with Plaintiff and an individual who appears to be Fernandez walking outside and beginning a conversation. Plaintiff appears to be quite animated, gesturing and leaning forward as he speaks. After conversing for some time, Plaintiff, Fernandez, and two other guards begin walking toward the camera, with Plaintiff in front. Plaintiff appears to be talking as they walk, occasionally turning his head as if to be heard by the guards behind him (see video at Doc. 133).

As they walk, Plaintiff stops, turns completely around, steps toward the individual with whom he was having the conversation (presumably Fernandez), and stands close to the

front of Fernandez. Fernandez appears to point forward, as if telling Plaintiff to keep walking. At this point in the video, Plaintiff and the other individuals have reached the bottom of the camera frame so that only their upper bodies can be seen. It does not appear that Plaintiff is raising the cane or his arm holding the cane, but it is not entirely clear. Plaintiff turns partly back toward the camera, leans to his right, and a scuffle begins. It appears that Bollweg grabs Plaintiff's arms and brings them behind his back (see id.; Doc. 131, DSOF ¶ 55; Doc. 146, PSOF ¶ 59). The three Defendants then surround Plaintiff and hold his arms, blocking any view of Plaintiff's arms and hands. As a result, it cannot be seen whether Plaintiff resists application of the handcuffs. Plaintiff remains standing throughout this event. The video shows that no one raises a knee into Plaintiff's back; however, it cannot be seen whether an arm or hands are pushed into his back (see Doc. 133).

The conclusive facts that can be gleaned from the video are that Plaintiff stopped walking, turned around, stepped toward Fernandez, and faced him in close proximity as the parties were headed toward the enclosure; that nobody placed a knee in Plaintiff's back; and that Plaintiff was not taken to the ground (id.).[18] As to the disputed facts, the Court must take as true for purposes of this motion Plaintiff's allegations that he did not raise his cane, he was not using abusive or profane language, there was no verbal command to "cuff up" or to submit to cuffing, and he did not resist cuffing (Doc. 146, PSOF ¶¶ 58, 66-68, 72).[19] But the act of stopping, turning, and stepping toward Fernandez in close proximity is confrontational, particularly where Plaintiff is holding a cane. That action, combined with Plaintiff's refusal to follow an order, supports that there was need for some force at the point Plaintiff turned around.

The video shows that after Plaintiff is cuffed, he is standing still and hunched over,

---

[18]The video shows Plaintiff turning to face Defendants at the 9:26:23-24 mark (Doc. 133).

[19]Defendants' objection to PSOF ¶ 72 is overruled. PSOF ¶ 72 does not lack foundation; it is supported by Plaintiff's declaration and Fernandez's interrogatory response. See Fed. R. Civ. P. 56(c)(4).

with assistance from Fernandez (Doc. 131, DSOF ¶ 67).  Once the gurney arrives, Plaintiff is placed face down onto the gurney (Doc. 133).  The video is choppy and plays in fast motion, so it is somewhat difficult to determine how forcefully Plaintiff was placed on the gurney.  When played frame by frame, however, it is clear that two officers placed Plaintiff on the gurney while a third reached from the other side to assist.  Although the motion is quick given the choppy nature of the video, it does not appear that Plaintiff was pushed forcefully onto the gurney.

### c.  Relationship Between Need for Force and Force Used

Regardless of the disruption, corrections officers must balance the need to "maintain or restore discipline" through force against the risk of injury to an inmate.  Hudson, 503 U.S. at 6.  In analyzing the relationship between the need for force and the force used, a simple overreaction by an officer is not enough to establish an Eighth Amendment violation.  Under the Eighth Amendment, the standard is malicious and sadistic force, not merely objectively unreasonable force, which is applicable under the Fourth Amendment.  Clement v. Gomez, 298 F.3d 898, 903 (9th Cir. 2002); see Hudson, 503 U.S. at 9 (not every malevolent touch gives rise to an Eighth Amendment claim).  The infliction of pain in the course of a prison security measure is not cruel and unusual punishment "simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense."  Whitley, 475 U.S. at 319.  In other words, even if grabbing Plaintiff's arms and cuffing him was not reasonably necessary to maintain discipline, it does not amount to cruel and unusual punishment unless the pain was inflicted "maliciously and sadistically for the very purpose of causing harm."  See id.

Plaintiff's allegations and the video arguably could support a view that Fernandez, Morrow, and Bollweg overreacted and applied more force than necessary given Plaintiff's age and medical condition.  There is no evidence to suggest, however, that Defendants' actions were malicious or sadistic.

The video does not support Plaintiff's allegation that he was pushed more than assisted onto the gurney, but, even when played in fast motion, his placement on the gurney

1  does not demonstrate malicious and sadistic conduct by Defendants.  The video shows that
2  the gurney was padded and that, short of lifting Plaintiff up by the arms—which would have
3  caused further pain—there was no easy way to place him on the gurney (Doc. 133).

### d.  Threat Perceived by Defendants

4
5  "[T]he extent of the threat to the safety of staff and inmates, as reasonably perceived
6  by the responsible officials on the basis of the facts known to them," is also relevant.
7  Whitley, 475 U.S. at 321.  Whitley cautioned that with the ever-present potential for
8  violence, "a prison's internal security is peculiarly a matter normally left to the discretion of
9  prison administrators."  Id. (quoting Rhodes v. Chapman, 452 U.S. 337, 349 n. 14 (1981)).

10  This factor considers the same facts address above in the discussion on the need for
11  force.  The threat posed by Plaintiff arose from his refusal to comply with Fernandez's order,
12  the fact that he had a cane—a potential weapon—in his hand, and his act of stopping,
13  turning, and stepping toward Fernandez in close proximity.  Given these facts and the ever-
14  present potential for violence in a prison, it was reasonable for Defendants to perceive some
15  threat from Plaintiff.

### e.  Efforts to Temper Severity of Force

16
17  Plaintiff alleges that Defendants failed to give any order to "cuff up" before they
18  grabbed his arms, suggesting that they could have tempered the severity of the force used.
19  But the Constitution does not prohibit uses of force that appear unreasonable in hindsight,
20  as long as the officers were acting in good faith and for a legitimate end.  See Whitley, 75
21  U.S. at 322.  In light of the threat perceived by Defendants, their failure to issue an order to
22  cuff up before acting to secure Plaintiff was understandable and appropriate in the moment.
23  Because correction officers "must make their decisions in 'haste, under pressure, and
24  frequently without the luxury of a second chance,'" they are to be given wide deference in
25  the execution of practices that they believe are needed to preserve order.  Hudson, 503 U.S.
26  at 6 (internal citation omitted).

27  In summary, analysis of the Whitley factors demonstrates that it was reasonable for
28  Fernandez, Morrow, and Bollweg to perceive a threat from Plaintiff; there was a need for

some application of force; and Plaintiff suffered some pain, but not serious injury. Although these Defendants may have employed more force that was necessary, the amount used was not so disproportionate as to suggest deliberate sadism. See Whitley, 475 U.S. at 322. Absent any evidence that force was applied maliciously or sadistically to cause Plaintiff harm, there exists no material disputed fact that Fernandez, Morrow, or Bollweg violated the Eighth Amendment in the force used when cuffing Plaintiff or placing him on the gurney. See Henderson v. City of Simi Valley, 305 F.3d 1052, 1061 (9th Cir. 2002) (where evidence of excessive force is "woefully sparse," the plaintiff fails to raise a material issue of fact regarding an excessive force claim). Accordingly, summary judgment will be granted to Defendants on the Eighth Amendment excessive-force claim.

### 2.  Madsen, Sutton, Long, Daters, and Brown

"[A] prison official can violate a prisoner's Eighth Amendment rights by failing to intervene" to prevent a violation imposed by someone else. Robins v. Meecham, 60 F.3d 1436, 1442 (9th Cir. 1995). A defendant-officer may be held liable for failing to intervene when he had enough time to observe what was happening and to intervene and prevent or curtail the violation, but failed to do so. See Lanier v. City of Fresno, 2010 WL 5113799, at *6 (E.D. Cal. Dec. 8, 2010) (citations omitted).

The Court has already determined that the facts fail to establish a triable issue of fact that Plaintiff was subjected to excessive force by Fernandez, Morrow, and Bollweg. With no Eighth Amendment violation, Madsen, Sutton, Long, Daters, and Brown cannot be liable under the Eighth Amendment for failing to intervene. Summary judgment will therefore granted to these four Defendants on the failure-to-intervene claim.

### VI.   First Amendment Claim

#### A.    Legal Standard

Allegations of retaliation against an inmate's First Amendment rights to speech or to petition the government may support a civil rights claim. See Rizzo v. Dawson, 778 F.2d 527, 531-32 (9th Cir. 1985); see also Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995); Valandingham v. Bojorquez, 866 F.2d 1135, 1138 (9th Cir. 1989). The Ninth Circuit has

held that the right of meaningful access to the courts extends to established prison grievance procedures. See Valandingham, 866 F.2d at 1138. Thus, an inmate's right of meaningful access to the courts and the right to petition the government for the redress of grievances preclude prison officials from penalizing an inmate for exercising those rights. Bradley v. Hall, 64 F.3d 1276, 1279 (9th Cir. 1995), abrogated on other grounds by Shaw v. Murphy, 532 U.S. 223 (2001); Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989).

"[A] viable claim of First Amendment retaliation entails five basic elements: (1) [a]n assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).

Retaliation claims must be evaluated in light of the concerns of excessive judicial involvement in day-to-day prison management, and courts must therefore "afford appropriate deference and flexibility" to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory. Pratt, 65 F.3d at 807.

**B.    Arguments**

**1. Defendants' Motion**

Defendants state that because there is no right to request medical treatment, Plaintiff's First Amendment claim is limited to alleged retaliation in response to his filing of grievances and complaints (Doc. 130 at 16). On that claim, Defendants contend that Plaintiff fails to state a First Amendment retaliation claim as required under Rhodes v. Robinson (id.).

With respect to the March 5, 2008 incident, Defendants assert that none of the inmate letters that Plaintiff filed after March 5, 2008 include claims that Fernandez interfered with Plaintiff's medical treatment, nor do they request an investigation of Fernandez (id. at 18). Defendants submit that Plaintiff's sole complaint was that he was transferred to SMU I after his refusal to return to his housing unit (id.). Defendants argue that Plaintiff's "self-serving statements" that he complained to Davenport about Fernandez are unsubstantiated (id.).

As to the July 8, 2008 incident, Defendants contend that Plaintiff did not file a related

complaint or grievance with Deputy Warden Davenport until *after* the July 8 incident, nor did Davenport advise Fernandez that Plaintiff complained about him until after July 8 (id. at 17).

Next, Defendants argue that Plaintiff had no problem exercising his First Amendment rights as evidenced by inmate letters filed after the March 5 incident, exhaustion of the inmate grievance procedures after the July 8 incident, and his filing of a federal civil right action (id. at 19).

Finally, Defendants contend that Plaintiff fails to show that Fernandez's actions did not advance a legitimate correctional goal (id.). They submit that Plaintiff's temporary transfer to SMU I in March served a legitimate goal of preserving internal order and discipline and maintained institutional security after Plaintiff admittedly refused to return to his assigned housing unit (id.). Defendants also point out that Plaintiff admitted to refusing Fernandez's order to relocate on July 8, 2008; thus, Fernandez's disciplinary report on that incident was not "false" as alleged by Plaintiff (id. at 20).

### 2. Plaintiff's Response

Plaintiff submits that the facts support his First Amendment retaliation claim against Fernandez (id. at 28). Plaintiff states that after Fernandez placed him in the enclosure on March 5, he complained to Deputy Warden Davenport about Fernandez, and Plaintiff asserts that his complaint to Davenport is protected by the First Amendment (id. at 28-29). Plaintiff alleges that it was not until Fernandez learned that Plaintiff had complained about him to Davenport that Fernandez decided to move Plaintiff to SMU I (id. at 29). Plaintiff therefore maintains that he exercised a constitutional right and in response, Fernandez moved him to SMU I, which did not advance any legitimate correctional goal because Plaintiff would have otherwise simply returned to his housing unit (id.).

Plaintiff further argues that Fernandez's actions on July 8, 2008 demonstrate retaliation (id.). Plaintiff maintains that there is no evidence to support Defendants' claim that CO II Selbe initiated the order to move him to Building 6, and Plaintiff alleges that Fernandez simply attempts to place the blame on Selbe (id. at 19). Plaintiff asserts that he

had a right to protest a move that would subject him to harm and, in response, Fernandez used excessive force and authored "bogus' disciplinary reports which did not advance any legitimate correctional goal (id. at 29).

### 3. Defendants' Reply

Defendants assert that it was not Plaintiff's complaint to Davenport that led Fernandez to move Plaintiff to SMU I on March 5, 2008; rather, it was Plaintiff's refusal to follow directives to leave the Health Unit (Doc. 153 at 8). Defendants note that Fernandez was not aware at the time that Plaintiff had complained about him (id.). Defendants assert that the disciplinary report Fernandez wrote following the March 5 incident was dismissed for a procedural error, not because it lacked merit (id. at 9).

Defendants maintain that Plaintiff can show only that he was subject to an adverse action in the form of disciplinary action (id.). But they argue that none of the other elements of a retaliation claim are met – there was no protected conduct because Plaintiff had no right to disobey directives, Plaintiff's First Amendment rights were not chilled, and Fernandez's actions served the legitimate penological purpose of preserving internal order and discipline (id. at 9). And they state that Fernandez did not write any "bogus" reports; Plaintiff was found guilty of disobeying an order and the other report appears not to have been processed (id. at 9-10).

### C.   Analysis

#### 1. Protected Conduct

Plaintiff alleges that on March 5, 2008, he personally complained to Deputy Warden Davenport about Fernandez, and that after Fernandez placed him in SMU I that same day he submitted grievances to further complain about Fernandez's conduct. As noted, filing grievances is a protected action under the First Amendment. Rizzo, 778 F.2d at 531-32; Valandingham, 866 F.2d at 1138.

As to Plaintiff's oral complaint to Davenport, the Court finds that it also constitutes protected conduct under the First Amendment. Had Plaintiff submitted a written grievance to Davenport with the same complaint, there is no question it would be protected conduct.

See id.  The fact that Plaintiff made his complaint orally—which may have been his only option given the factual circumstances—should not render the speech less protected.  See Banks v. York, 515 F. Supp. 2d 89, 111 (D. D.C. 2007) ("[t]he Court sees no reason to find that plaintiff's complaint is any less protected simply because he made it orally to an individual prison official rather than submitting it in writing through the grievance process"); Person v. Welborn, 471 F.3d 732, 741 (7th Cir. 2006) (declining to hold that "legitimate complaints lose their protected status simply because they are spoken," and finding that inmate's oral complaints about conditions of confinement and threats by guards were protected under First Amendment); see also Gomez v. Vernon, 255 F.3d 1118, 1123, 1126 (9th Cir. 2001) (recognizing retaliation claim in connection with inmate law clerk's oral concerns about library management and subsequent threats to transfer him, which caused him to quit the job); but see Teahan v. Wilhelm, 2007 WL 5041440, at *8-9 (S.D. Cal. 2007) (finding that, as to right to petition for redress of grievances, prisoner's oral objections not protected conduct because his right to petition for redress was not yet invoked; as to whether official retaliated in response to prisoner's right to free speech, district court noted that Ninth Circuit has not determined whether prisoner's oral complaints are protected under First Amendment).[20]

### 2.  Adverse Action

Plaintiff claims that Fernandez issued a disciplinary ticket and moved him to SMU I on March 5, 2008, and on July 8, 2008, Fernandez ordered him to move from Building 5 to Building 6 (Doc. 74 ¶¶ 16, 21; Doc. 145 at 19).[21]  Placement in disciplinary detention is clearly an adverse action.  Also, while the July 8, 2008 order to move was not

---

[20]The district court in Teahan found that it did not have to decide whether the prisoner's oral complaints were protected conduct because the retaliation claim failed on other grounds.  2007 WL 5041440, at *10.

[21]Plaintiff also alleges that Fernandez used excessive force in retaliation for Plaintiff's complaints (see Doc. 74 ¶ 37).  Because the Court has determined that Fernandez's conduct on July 8, 2008 did not amount to excessive force, that conduct and any disciplinary reports relating to that incident do not constitute adverse actions.

unconstitutional—as discussed above—a transfer, or even the mere threat of a transfer, may be considered an adverse action.  See Brodheim v. Cry, 584 F.3d 1262, 1269-70 (9th Cir. 2009); Rhodes, 408 F.3d at 568 (initiation of a prison transfer and destruction of property in retaliation for filing grievances); Pratt, 65 F.3d at 805-06 (prison transfer and double-cell status in retaliation); Rizzo, 778 F.2d at 530-32 (retaliatory reassignment out of vocational class and transfer to a different facility).

The parties dispute who issued the order for Plaintiff to move to Building 6 on July 8, 2008.  Defendants submit that the order came from Count Movement Officer Selbe (Doc. 131, DSOF ¶ 44).  Plaintiff disputes that assertion, arguing that it would be improbable since Selbe was the officer who had just assigned him to Building 5 (Doc. 146, PSOF ¶ 45; Doc. 145 at 19).  Plaintiff alleges that Fernandez names Selbe as the one who directed the move to shift the blame from away from Fernandez, and Plaintiff suggests that Fernandez sought to transfer him after seeing him earlier that morning and learning that he was back at the Cook Unit (Doc. 146, PSOF ¶ 48; Doc. 145 at 19).

There is no sworn statement from Selbe to verify whether he issued the order to move Plaintiff, nor is there any documentary evidence of a transfer order that might show who authorized Plaintiff's move on July 8, 2008.  For the purposes of this analysis, the Court determines that there is a material factual dispute as to Fernandez's involvement in the order to move Plaintiff on July 8, 2008.

### 3.  Adverse Action "Because of" Protected Conduct

Plaintiff must show that his protected conduct "was a substantial or motivating factor behind the defendant's decision."  Soranno's Gasco, 874 F.2d at 1314 (internal citations omitted).  This may be accomplished by demonstrating that Fernandez knew of the protected conduct and evidence that (1) there was proximity in time between the protected conduct and the allegedly retaliatory action, (2) Fernandez expressed opposition to the speech, or (3) Fernandez's proffered reason for the adverse action was false or pretextual.  Corales v. Bennett, 567 F.3d 554, 568 (9th Cir. 2009); see Pratt, 65 F.3d at 808 (timing can be considered as circumstantial evidence of retaliatory event).

### a.  March 5, 2008 Incident

The Court first analyzes whether the facts support an adverse action because of Plaintiff's oral complaint about Fernandez to the Deputy Warden on March 5, 2008 (Doc. 146, PSOF 27).  The parties dispute whether Fernandez placed Plaintiff on report and ordered his transfer to SMU I before Plaintiff was first brought to the holding enclosure or after Plaintiff's complaint to Davenport and his return to the Health Unit.  Taking Plaintiff's allegations as true, Fernandez made no mention of a disciplinary ticket and transfer to SMU I until after Plaintiff spoke to Davenport and returned to the Health Unit.

The initial question is whether Fernandez was aware of Plaintiff's oral complaint to Davenport.  See Corales, 567 F.3d at 568.  Fernandez avers that he was not advised by Davenport that Plaintiff had complained about him until after the July 8 incident (Doc. 131, Ex. C, Fernandez Decl. ¶ 51).

The only evidence that Plaintiff proffers to support that Fernandez was aware of the complaint is Plaintiff's own declaration, in which he states that after he returned to the Health Unit, Fernandez appeared "and was visibly upset because I had complained to Warden Davenport about him and because I had Davenport intervene on my behalf" (Doc. 146, Ex. A, Pl. Decl. ¶ 18).  Plaintiff may testify based on his visual observations of Fernandez's conduct and demeanor.  See Fed. R. Evid. 701; United States v. Durham, 464 F.3d 976, 982 (9th Cir. 2006); see also Celotex, 277 U.S. at 324.[22]  But Plaintiff is not competent to testify as to Fernandez's actual state of mind or why Fernandez behaved in a certain manner.  Notably, Plaintiff does not assert that he told Fernandez that he complained to Davenport, nor does Plaintiff assert that Fernandez said anything to him about a complaint to Davenport.

A review of the inmate letters that Plaintiff filed after the March 5 incident and that are in the record do not provide any support for a conclusion that Fernandez was aware of Plaintiff's oral complaint before he issued Plaintiff a disciplinary ticket (Doc. 131, Ex. L,

---

[22]Defendants' objection to that part of PSOF ¶ 30 stating that when Fernandez appeared back at the Health Unit he was visibly upset is overruled for the reason set forth above (Doc. 153 at 15).  See Fed. R. Evid. 701; Durham, 464 F.3d at 982.

Exs. 1-2 (Doc. 131-2 at 39, 41)).  Plaintiff's primary complaint in these inmate letters is his placement in SMU I after he complained and argued with officials about inmates smoking in his housing unit (id.).

In short, there are no specific facts or evidence to show that Fernandez was aware of Plaintiff's protected speech before issuing the ticket and moving Plaintiff to SMU I. Plaintiff's testimony that Fernandez was upset because of the complaint to Davenport is purely speculative and conclusory and is insufficient to establish a genuine issue of material fact.  See Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) ("conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment").  Because Plaintiff cannot demonstrate that Fernandez knew of Plaintiff's protected conduct, he cannot show that the protected conduct was a motivating factor behind Fernandez's action, and the retaliation analysis ends. See Soranno's Gasco, 874 F.2d at 1314; Corales, 567 F.3d at 568.

### b.  July 8, 2008 Incident

The final question is whether the facts support that Fernandez ordered Plaintiff's transfer in response to Plaintiff's grievances stemming from the March 5, 2008 incident.  As stated, Fernandez avers that he was unaware of any complaints about him by Plaintiff until after the July 8 incident (Doc. 131, Ex. C, Fernandez Decl. ¶ 51).

Plaintiff avers that his inmate letters to Davenport and Stewart complained about Fernandez and requested that he be investigated (Doc. 146, Ex. A, Pl. Decl. ¶ 20).  Even though there are no copies of these inmate letters in the record, there is no dispute that none of these inmate letters were addressed to Fernandez.

Defendants submit two other inmate letters filed by Plaintiff on March 6 and April 2, 2008; the first sent to CO III "Ms. K" and the second to Deputy Warden Diaz (Doc. 131, Ex. L, Exs. 1-2).  As mentioned above, the primary complaint in these two letters is Plaintiff's placement in SMU I after his complaints and argument with officials about inmates smoking in his housing unit (id.).  Again, neither of these letters were addressed to Fernandez.

On this record, there is no evidence that Fernandez received or was aware of any

inmate letters or grievances filed by Plaintiff.  And the Court has already determined that there is no evidence that Fernandez was aware of Plaintiff's oral complaint.  Plaintiff cannot establish causation because there is no material factual dispute that Fernandez was aware of Plaintiff's protected conduct before the events of July 8, 2008.  See Soranno's Gasco, 874 F.2d at 1314; Corales, 567 F.3d at 568.  The Court will therefore grant summary judgment to Fernandez on the First Amendment claim.

In light of the determination that there was no excessive force or retaliation by Defendants, the Court need not address Defendants' qualified immunity argument.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 130) and Plaintiff's Motion for Extension of Time to File Response to Defendants' Motion to Supplement their Statement of Facts and Motion for Leave to File a Sur-Reply (Doc. 160).

(2) Robert Stewart, Alex Davenport, and all John and Jane Does are dismissed as Defendants.

(3) Plaintiff's Motion for Extension of Time to File Response to Defendants' Motion to Supplement their Statement of Facts and Motion for Leave to File a Sur-Reply (Doc. 160) is **denied**.

(4) Defendants' Motion for Summary Judgment (Doc. 130) is **granted**.

(5) The Clerk shall enter judgment accordingly and terminate the action.

DATED this 13th day of March, 2012.

David G. Campbell
United States District Judge